### STATE ex BRICKER v INDUSTRIAL GAS CO

Ohio Appeals, 2nd Dist, Franklin Co

No 2733. Decided May 25, 1937

John W. Bricker, Attorney General, Columbus, and Wm. J. Berwonger, Asst. Atty. Gen., Columbus, for appellees.

Edward J. Farrell, T. M. Potter, and J. R. Fitzgibbon, for appellant.

## OPINION

By HORNBECK, J.

Plaintiff by a third . amended petition prayed for a judgment against the defendant in the sum of $16.679.96. with interest, for excise tax, penalty and maintenance fee for the years 1933 and 1934.

The petition averred that the defendant was a public utility incorporated in the State of Ohio and duly organized and existing under and by virtue of the laws of the State of Ohio, and is engaged in the business of producing, acquiring, distributing, furnishing, supplying, transmitting and selling natural gas for light, power and other purposes in the State of Ohio. The answer of the defendant· admits that it is an Ohio corporation but denies that it is a public utility corporation and denies any indebtedness to the State of Ohio as averred in the petition.

The cause came on for trial, the jury being waived, and was submitted to a judge of the Common Pleas Court upon the pleadings and agreed statement of facts, resulting in a finding and judgment for the plaintiff in the sum prayed in the petition. An appeal on questions of law is prosecuted.

There is one question only for this-court on the appeal, namely: Did the trial court err in its determination that the defendant was a public utility during the years for which the taxes set out in the petition were charged against the defendant?

The agreed statement of facts, somewhat epitomized, is:

1. The defendant is a domestic Ohio corporation, organized June 30, 1936.

2. The purpose clause in the articles of incorporation of defendant company reads:

"For the purpose of producing, acquiring, distributing, furnishing, supplying, transmitting and selling natural gas for light, power and other purposes and in connection therewith, acquiring, holding, operating and disposing of properties, franchises, rights, privileges and leases and doing all things necessary and incidental thereto."

3. The defendant corporation since its incorporation has been engaged in the business of piping and supplying natural gas for light, heat and power purposes to consumers within this state in the vicinity of Zanesville, Roseville, Crooksville and Newark and outlying districts.

4. The defendant procures its supply of natural gas from other companies and distributes and sells it for both industrial and domestic purposes.

5. Upon application to the Public Utilities Commission of the State of Ohio, Orton C Dunn, trustee, was authorized to sell all property rights and other assets of the Hopewell Fuel and Gas Company and the defendant company was authorized to buy said property and assets.

6. Relates to the acquisition by defendant of the assets of the Swingle Gas and Oil Company, a public utility serving natural gas to said territory at Roseville ˙and Zanesville, Ohio.

7. The defendant company filed with the Tax Commission of Ohio statement of its gross receipts as a public utilities for the years 1927 to 1932, inclusive, and paid excise taxes for those years and no report was filed with said Commission for the year 1933 and that a report was filed in 1934 under protest.

8. In January, 1934, a protest was filed with the Utilities Commission because of the discontinuance of service of natural gas to certain consumers and that the Commission in February, 1935, ordered the company to restore its services to said consumers pursuant to the scheduled rates on file with the Commission, from which action of the Commission no appeal was prosecuted.

9. States the names and locations of the consumers of gas to which the defendant distributed and sold natural gas in the year 1932.

10. Same as "9" for the year 1933.

11. Same as "9" for the year 1934.

12, 13 and 14. State the amount of gas furnished by the defendant company during the years 1932, 1933 and 1934, respectively, which was in 1932, 1,020,638,000 cubic feet; in 1933, 930,420,000 cubic feet; in 1934, 1,092,062,000 cubic feet.

15 and 16. State the gross receipts of defendant company for the year 1933 to be $294,143.00; 1934, $303,776.00.

17 and 18. Set forth the amount of excise tax, penalty and maintenance fee charged against the defendant in the years 1933 and 1934.

19. "That the Industrial Gas Company has never by express grant been authorized to place its pipe lines in any public street, highway, road, alley or way but that the pipe lines of said company do cross and occupy certain public streets, alleys and highways in the territory served by the company."

20. That the defendant company furnishes natural gas to domestic consumers under special contracts entered into with each customer, although there is on file with the Utilities Commission a schedule of rates to be charged and that in the Cambridge district in the years 1933 and 1934 "all domestic consumers with the exception of one were furnished gas as a consideration of pipe line rights of way obtained over the property of such customer and that each customer was billed for the amount of gas consumed at the price agreed upon in the contract."

21. Relates to gas sold and distributed in the Zanesville district in the year 1933 and shows that there were 19 domestic consumers furnished gas by virtue of special contracts 13 of whom were furnished gas as a consideration of pipe line rights of way obtained over the property of said customers.

22. "That all the gas sold for industrial purposes was sold under special contract made to different industrial concerns in Cambridge, Zanesville, Crooksville, Roseville and Newark at different prices."

23. That the domestic consumers served the natural gas for those whose residences were near the pipe lines of the company; that the company made no extensions to its lines for the sole purpose of furnishing gas service to domestic consumers and that it never held itself out to serve the public domestic natural gas service indiscriminately to the limit of its capacity.

24. That the defendant never exercised the right of eminent domain and that it has not by express writ and grant accepted a franchise to use the public streets, alleys or ways for the purpose of placing its pipe lines, although the lines of the company do cross and occupy certain public streets, alleys and ways.

25. That the defendant sells the greater portion of its gas to selected industrial consumers under a written contract of years and at a rate stipulated in each contract.

26. That the defendant secures the rights of way for its pipe lines by negotiation and contract and in most instances as a part of the consideration therefor agrees to furnish gas to the owner of the property through which the lines pass, which arrangement is made by private contract only.

27. That the defendant has filed its report with the Tax Commission for each year as a public utility, showing all property owned by it, used in connection with or incidental to its operations and that it has paid its property taxes as a public utility.

28. That the defendant has never filed with the Utility Commission of Ohio an application for an abandonment of its services as a public utility and the schedule of rates and regulations of the company heretofore referred to are now on file with the Utility Commission.

Upon this factual statement the defendant urges that during the years comprehended in the third amended petition it was not a public utility, but a private trading corporation. We shall not undertake to discuss all the propositions urged, nor to set forth all of the cases cited. The briefs are comprehensive and we have given careful attention to the interesting question presented.

Sec 614-2, GC, sets forth many definitions found in the act creating the Public Utilities Commission and defining its duties and the scope of its jurisdiction. Among other things it is provided:

"The following words and phrases used in this chapter unless the same is inconsistent with the text, shall be construed as follows:

"Any * * * corporation, wherever organized or incorporated; * * *

"When engaged in the business of supplying natural gas for lighting, power or heating purposes to consumers within this state is a gas company, * * *."

Sec 614-2a GC defines public utility:

"The term 'public utility' as used in this act, shall mean and include every corporation, * * * defined in the next preceding section, except such public utilities as operate their utilities not for profit, and except such public utilities as are, or may hereafter be owned or operated by any municipality, and except such utilities as are defined as 'railroads' in §§501 and 502 GC, and these terms shall apply in defining 'public utilities' and 'railroads' wherever used * * * in this act."

And §614-3 GC vests the Public Utilities Commission of Ohio with power and jurisdiction to supervise and regulate public utilities, etc.

By the express terms of the sections quoted the defendant is clearly defined as a public utility. It is the █ claim of the defendant that the Legislature is without power to define a public utility in disregard of the essentials that it hold itself out to serve the public indiscriminately, exercise the right of eminent domain or obtain franchise rights to use public ways for the benefit of the public.

It is the position of the defendant that determination must be made from the facts whether or not in conducting its business it does the things which are recognized as essentially associated with public utility corporations. In support of this position we are cited to Terminal Taxicab Company v Kurtz, 241 U. S. 252; Allen v Railroad Commission of California, 8 A.L.R. 249; Village of St. Clairsville v Public Utility Commission, 102 Oh St 574, 586; State Public Utilities Commission ex Macon County Telephone Company v Bethany Mutual Telephone Association, 270 Ill. 182; People ex Scott v Ricketts, 248 Ill. 428; State Public Utility Commission v Monarch Refrigerator Company, 267 Ill. 528; State Public Utility Commission v Telephone Company, 248 Ill. 411; Richmond v Carneal, 14 A.L.R. 1341; Producers Transportation Company v Railroad Commission, 251 U. S. 228;

Motor Freight, Inc. v Utility Commission, 120 Oh St 1; Railroad Company v Public Utilities Commission, 121 Oh St 588; Brewer v Utilities Commission, 118 Oh St 95; Hissem v Guran et, 112 Oh St 59; Jonas v Swetland Company, 119 Oh St 12; Southern Ohio Power Company v Public Utility Commission, 110 Oh St 246; State v Factory Company, 16 O.N.P. (N.S.) 545; Allen v Railroad Commission, 179 Cal. 68, 8 A. L.R. 249.

We consider some of the Ohio cases cited.

In Village of St. Clairsville v Public Utility Commission, supra, the question was not whether either company before the court was a public utility. It was conceded that both companies were public utilities. The quoted statement of Chief Justice Marshall was a general observation that the East Ohio Gas Company had not exercised its corporate power to the extent set forth in its Articles of Incorporation, and to mark the distinction between the existence of corporate power and the use of that power.

In Motor Freight, Inc. v Public Utility Commission, supra, reference is made to the third syllabus:

"Carriers operating * * * are not subject to public regulation unless such carriers hold themselves out as willing to serve the public indiscriminately."

For that reason, among others, Chief Justice Marshall, at page 8 held that the Motor Freight was not a "motor transportation company" under §614-84, GC. This determination in no sense questioned the validity of the statute. On the contrary, it was made strictly within the terms of the statute, which provided, among other things, that a motor transportation company must be a common carrier. The essentials of a common carrier are well established and the statute evinces no purpose to modify of limit its accepted meaning.

In Hissem v Guran et, supra, the question was whether or not the owner of a motor transportation outfit was a common carrier.

Jonas v Swetland Co., supra, presented no facts which gave a semblance of proof that the Swetland Company was engaged in the business of selling electricity and therefore a public utility.

Some difficulty is found with the broad statements of the law in Southern Ohio Power Company v Public Utility Commission, supra, wherein Chief Justice Mar-

shall wrote the opinion with concurrences by Jones, Day and Allen, JJ., and dissent by Robinson and Matthias, JJ. Two of the three propositions of the syllabus are germane to our question:

"1. A dedication of private property to public utility service will not be presumed from the fact that the product and service of the use of such property is the usual subject matter of utility service; neither does such presumption arise from the sale by private contract of such product and service to utility corporations for purposes of resale. Such dedication is never presumed without evidence of unequivocal intention.

"2. To constitute a 'public utility' the devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately, or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state."

The first syllabus determines that in this case unequivocal intention to dedicate the property of the defendant to public use must appear. The primary ▮▮▮▮▮▮ purpose and intention of the defendant to so dedicate its property would appear by the general purpose clause of its corporate franchise and by its conduct prior to 1933.

Applying the subject matter of the second syllabus, it can not be said under the agreed statement of facts that the product and service of the defendant company is available to the public generally and indiscriminately, or that there has been an acceptance by the company of public franchises. However, there is marked difference in the facts in the cited case and those in the instant case. At the time of the rendition of the judgment in the cited case the power company sold none of its products to any person or firm other than two companies, neither of which utilized the electrical energy sold for any purpose other than resale at a profit. However, the Southern Ohio Power Company, against which an order of the Public Utility Commission was sought, had not exercised the right of eminent domain, had not at any time received any public franchises and had not held itself out to the public as willing to serve the public generally. The law in the syllabus must be considered in the light of the facts in the case. There

is little similarity between the facts here and in the cited case.

The conduct of the defendant company raises a strong presumption that it is a public utility. This is evidenced by the purpose clause of the Articles of Incorporation of the company, its reports of gross receipts as a public utility and payment of taxes as such utility, application to the Public Utility Commission to buy property of other public utilities, handling natural gas, application for increased rates for service; use of public property for its lines and the distribution and sale of its products to its patrons, both industrial and domestic; its acquiescence by failure to prosecute appeal in an order of the Public Utilities Commission made upon the theory that it was a public utility. There has been no change in its purposes and activities according to the record, but it is insisted that it never was a public utility. It asserts that it has not used its right of eminent domain, although it concedes that it has the use of public streets ▮▮▮▮▮▮ and ways, secured by private contract. It seems to us that when it voluntarily brought itself within a classification which would have permitted it to exercise its right of eminent domain had it been necessary, that this is convincing evidence that it was a public utility, though standing alone not controlling. Having the right to exercise this unusual prerogative may have materially assisted in its consummation of private contracts.

The business of the defendant company consists of distributing its product to many industrial concerns widely separated, for which it receives a substantial return. It consumes little or none of the product which it distributes and the service to others can not be said to be incidental, as in the cases of Story v Friend Wallace, Richardson, etc., 98 Pac. 1057; State of Mo. ex Danciger & Co. v Public Service Commission of Mo., 275 Mo. 483. The distribution and sale of natural gas is the sole business of the defendant company and in no sense incidental. It does not furnish its product to the general public indiscriminately. If it is necessary to so find without limitation to classify it as a public utility, such determination ▮▮▮▮▮▮ could not be made. However, we do not conceive the test to be so narrow.

In Mill Creek Coal & Coke Co. v Public Service Commission (W. Va.), 100 SE 557, an appeal by the company from an order

207

of the Public Service Commission directing the continuance of service at a rate theretofore fixed, the company urged, among other things, that the furnishing of electric current to industrial concerns to be used by them for private profit is not of such a public character as to subject such service to regulation by the Commission. At page 1087:

"It is generally the privilege of the dedicator of property or service to public use or regulation to determine, subject to the sanction of the unit of government under which it acts, the extent of that dedication. When such dedication has been made and has received official sanction, it is conclusive against an attack of this nature. The converse of this situation is presented in the decision rendered today in Clarksburg Light & Heat Co. v Public Service Commission, (W. Va.) 100 SE 551, in which the question was squarely presented whether the service of natural gas, the supply of which is limited by nature, to industrial concerns, to be used by them for private profit. is or is not of such a public character as to subject such service to regulation by the Commission."

The case cited supported the right of the Commission to regulate the company predicated upon the determination that it was a public utility.

In Clarksburg Light & Heating Company case it is said in the third syllabus:

"The use which the consumer makes of the commodity furnished does not constitute the test as to whether or not the regulatory powers of the commission in dealing with public utilities may be invoked. It is the duty which the purveyor or producer has undertaken to perform on behalf of, and so owes to, the public generally, **or to any defined portion of it**, as the purveyor of the commodity, or as an agency in the performance of the service, which stamps the purveyor or the agency as being a 'public service utility'." (Emphasis ours).

At page 553 of the opinion it is said:
"The petitioner earnestly contends that the Public Service Commission has no authority to regulate the rates to be charged by it to its manufacturing consumers. It contends that this is not a public service, and is not subject to the regulatory power of the state, and that the order of the commission fixing the rate to be charged by it to such consumers is without authority of

law. It can not be doubted that the language of the act (᾿ * *) conferring jurisdiction upon the Public Service Commission to regulate the business of public service corporations is broad enough to include the petitioner. * * * But petitioner's contention is that the Legislature did not have power to make of it a public service corporation, or to make any part of its business subject to the regulatory power of the commission, unless the nature of the business was such as to make it subject to the police power of the state. It is quite true that the Legislature can not arbitrarily convert a private business into a public one for the purpose of regulation, unless there is a substantial basis for the exercise of the police power. The question of whether any particular business comes within the regulatory power of the Legislature, or the Public Service Commission in this case as the agent of the Legislature, in the last analysis, is one for the courts to determine. In reaching a conclusion, however, the public policy of the state as announced by the Legislature will be given due weight, and the determination of the Legislature that a particular business is subject to the regulatory power of the state, because the public welfare is dependent upon its proper conduct and regulation, will not be lightly disregarded by the courts. * * *"

At page 554:
"And it may be said that whenever the relation of any business or enterprise to the public, or **to any substantial part of a community**, becomes so close as to make the welfare of the public, **or any substantial part of it,** depend upon the proper conduct of such business, then it becomes a subject upon which the regulatory power of the state may be exercised for the benefit of the whole, and the determination by the Legislature that a particular business belongs to such class will not be set aside, * * *." (Emphasis ours).

In this case it is probable that the purpose of the organization of the defendant company was to serve almost exclusively industrial concerns and this is the present practice of the company. That it is not willing to serve any industrial company who is accessible to its lines does not appear. In our judgment such industries along the route of defendant's lines are an integral part of the public and service to

them may be said to be service to the public.

In Re: Colorado Interstate Gas Company, Public Utility Reports, 1933 (E), 349, there is marked similarity between the facts and those of the instant case, upon which the following syllabus was pronounced:

"Notwithstanding the claimed power to reject business of some customers and to fix different standards for different customers, a pipe-line company furnishing a wholesale natural gas supply to industrial consumers through local distribution systems was held to be a public utility subject to commission regulations, since it held itself out to serve the public generally if it could make proper terms with the various parties seeking such special service."

There also appears the further fact that some domestic consumers are served by the defendant. We attach little significance to this alone. However, independent of this service, we are satisfied that the conduct of the business of the defendant corporation in the manner appearing in the agreed statement of facts clearly brings it within the classification of a public utility and subjects it to the obligations thereof, including the payment of excise taxes, penalties and maintenance fees, for which the action of plaintiff was instituted. If "public use" be given the restricted meaning contended for by the defendant company, it is conceivable that utilities could serve great numbers of consumers of their product directly if confined to a class and escape any obligation as a public utility and prevent any regulation by the state.

Inasmuch as everything indicates that the company considered that it was a public utility prior to 1932 and so conducted its business, it is contemplated by our statutory procedure that its classification may only be changed by following the law set up for the abandonment of the business of a public utility. We recognize that the court held in Southern Ohio Power Co. v Public Utility Com. that the power company was no longer a public utility, although it had not proceeded under the statute to bring about abandonment of its business. We are satisfied, however, that the facts in this case are not so analogous to those in Southern Ohio Power Co. v P. U. C. as to permit dissolution or abandonment of the utility without observance of the statutory procedure.

The judgment will be affirmed.

BARNES, PJ, concurs.
GEIGER, J, not participating.